IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XPO LOGISTICS, INC., a Delaware corporation, | **MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| v. | |
| AARON PETERSON, an individual, | Case No.  2:15-cv-703-CW |
| Defendant. | |
| ─────────────────────────── | Judge Clark Waddoups |
| AARON PETERSON, an individual, | |
| Cross-claim Plaintiff, | |
| v. | |
| XPO LOGISTICS, INC., a Delaware corporation, | |
| Cross-claim Defendant. | |

Before the court is XPO Logistics, Inc.'s ("XPO") Motion for Summary Judgment[1] and Aaron Peterson's Cross-Motion for Summary Judgment.[2]  Both motions turn on the application of Utah's judicial proceedings privilege to the contents of a confidential settlement communication sent by XPO's outside counsel. That communication was sent to counsel for Leeway Global Logistics, LLC during the pendency of an action between XPO and Leeway.

---

[1]    *See* XPO's Motion for Summary Judgment ["Def's Mot."], ECF No. 248.

[2]    *See* Peterson's Cross-Motion for Summary Judgment ["Pl's Mot."], ECF No. 250.

In its motion, XPO claims that the judicial proceedings privilege provides it immunity from Mr. Peterson's claims of defamation, false light, tortious interference, injurious falsehood, and identity theft. And in his motion, Mr. Peterson argues that he is entitled to judgment as a matter of law on these same claims.[3]

The court, now having carefully considered and reviewed the summary judgment motions and briefs filed by the parties, the evidence submitted for and against the motions, and having heard oral argument on the motions, and for reasons discussed more fully below, hereby grants XPO's Motion for Summary Judgment and denies Mr. Peterson's Cross-Motion for Summary Judgment.

---

[3]    Although Mr. Peterson argues at length in his Cross-Motion for Summary Judgment and in his opposition to XPO's Motion for Summary Judgment that he is entitled to judgment on his defamation and false light claims, those claims were long ago dismissed by the court or conceded by Mr. Peterson. *See Peterson v. XPO Logistics, Inc.*, No. 2:17-cv-307, 2017 WL 5054706, at *2–3 (D. Utah Nov. 2, 2017) (noting that "Peterson acknowledges that the false light claim does not state a claim and, therefore, concedes to the claim's dismissal," and holding that "Peterson's defamation claim also fails as a matter of law because he has not and cannot allege that one or more of the email statements relating to him were actually defamatory"), rev'd and remanded, 812 Fed. App'x 754 (10th Cir. 2020). Although, as noted, Peterson appealed this decision, he did so only so on the issue of the application of the judicial proceedings privilege: he did not appeal dismissal of his defamation or false light claims. *See* Brief of Appellant Aaron Peterson, 2018 WL 1790531, at *13 n.3 (noting that "Mr. Peterson is not seeking reinstatement of his claims for defamation or false light and has therefore not directly included those claims in his analysis").

# INTRODUCTION[4]

XPO filed an action against Mr. Peterson, a former XPO employee, on September 29, 2015, asserting claims for breach of contract, tortious interference, and aiding and abetting breach of fiduciary duty (the "Initial Action").[5]  In the Initial Action, XPO alleged that Mr. Peterson breached his contractual and employee fiduciary duties by, among other things, soliciting XPO's customers and employees and using XPO's confidential information to benefit Leeway Global Logistics, LLC ("Leeway"), XPO's direct competitor.

On April 29, 2016, during the pendency of the Initial Action and in connection with the Initial Action, XPO's attorney, Robert Smeltzer, sent Leeway's attorney an email, entitled "XPO v. Leeway—Inadmissible FRE 408 Discussion." That email contained an email purportedly sent from Mr. Peterson to Josh Morin, dated April 19, 2016, and a reply email purportedly sent back from Mr. Morin to Mr. Peterson the same day (the "Subject Emails").  The Subject Emails purport to show that Mr. Peterson, an employee of Leeway at the time, was aware of efforts to target an XPO employee to join Leeway and perhaps bring some business with him.

The first Subject Email states:

---

[4]     Page references in this memorandum decision refer to the page numbers assigned by CM/ECF when each document was filed, which is page number that appears at the top of each page.  Given its long history, the parties are thoroughly familiar with the underlying facts and background at issue, therefore the court will only briefly recite the facts relevant to its determination of the pending motions.

[5]     Case No. 2:15-cv-703.

> *Josh,*
>
> *As you are well aware we are in full swing with Hanjin.*
>
> *MTD—65 shipments for over 123,000 in gross margin.*
>
> *We are being pestered for a tracking application. Do you have a go live date? I know we are waiting for Casey's contract to end with XPO before we proceeded full speed however I am wondering how much longer I can actually keep them at bay. Did you and Casey A. Come to a conclusion about a start date? Casey McKell is wanting to put some leads aside for when Casey A comes on board full steam. Will you let Casey M know how the conversation went on Friday with Casey A?*
>
> *Thank you.*
>
> *AP*[6]

The response Subject Email, purportedly from Mr. Morin to Mr. Peterson that same day, states:

> *Aaron,*
>
> *I am ecstatic to hear Hanjin is working out well for you guys.*
>
> *I am not sure we are readily available to pull Casey from XPO. The new BP bonused him $30,000 with no real expectations. That will be paid up in May. We originally wanted to pull him out then but they are making more changes and I think he could continue to feed us invaluable information. When we met Friday I learned they are currently working on assigning him Campbell's and its looking to be much larger than Hanjin. To reiterate let's keep siphoning off what we can till our hand is forced they are literally clueless. Everything is in his dad's name so we aren't risking anything.*
>
> *Copying in Casey McKell so he is in the loop.*
>
> *JM*[7]

On May 2, 2016, shortly after receiving the email exchange from XPO's

---

[6]    Def's Mot., Ex. H, ECF No. 248-9 at 2 (emphasis added).

[7]    *Id.* (emphasis added).

attorney, which included the reproduced Subject Emails, Leeway terminated Mr. Peterson's employment.

On April 19, 2017, almost one year after the Subject Emails were initially sent, Mr. Peterson filed a separate action against XPO (the "Second Action")[8] concerning the Subject Emails.  In his complaint in the Second Action[9] and in his subsequently filed counterclaims to the Initial Action,[10] Mr. Peterson asserts that he did not participate in the April 19, 2016, email exchange and that the Subject Emails were forgeries drafted by XPO employees to damage Mr. Peterson.[11]  The Second Action alleges causes of action against XPO for defamation, tortious interference, false light, injurious falsehood, and identity theft.  The Second Action was randomly assigned to another judge in the District of Utah.

On November 2, 2017, XPO filed a motion to dismiss in the Second Action arguing, among other things, that Mr. Peterson's claims were barred by the judicial proceedings privilege because XPO's attorney published the Subject Emails to Leeway's attorney during the course of litigation proceedings (specifically during settlement discussions) in the Initial Action.[12]  The court agreed and granted XPO's

---

[8]    Case No. 2:17-cv-307.

[9]    *See* Case No. 2:17-cv-307, ECF No. 2.

[10]    *See* Case No. 2:15-cv-703, ECF No. 193 at ¶¶18–19, 23–26 (filed Nov. 27, 2019).

[11]    *See* Case No. 2:17-cv-307, ECF No. 2 at ¶¶18–19, 23–26.

[12]    *Peterson v. XPO Logistics, Inc.*, No. 2:17-cv-307, 2017 WL 5054706, at *2–3 (D. Utah Nov. 2, 2017) ["*Peterson I*"], rev'd and remanded, 812 Fed. App'x 754, 758–60 (10th Cir. 2020) (unpublished).

motion noting that, "[w]hile there is a bad faith fraud exception to the application of the litigation proceedings privilege, Peterson does not assert a fraud claim."[13]  The court did so despite recognizing there were some problems with the Subject Emails, including that the "date on the emails state Monday, April 19, 2016, when in fact April 19, 2016, was a Tuesday," the email address for Mr. Peterson was "inconsistent in the original email and the reply, which the computer should have automatically generated to go to the same email address from which the original email was sent," and that the "reply email appears to have been sent hours before the original email."[14]

The court also dismissed Mr. Peterson's defamation claim on the independent ground that, as a matter of law, the statements in the Subject Emails relating to him were not defamatory.[15]  The court also noted that Mr. Peterson had conceded that he failed to state a false light cause of action.[16]

On appeal the Tenth Circuit Court of Appeals reversed and remanded, finding that even though Mr. Peterson had not asserted a specific fraud claim, "complaining parties need only allege facts showing bad faith to trigger the *Moss* exception to the Utah judicial proceedings privilege" to avoid dismissal.[17]

---

[13]     *Id.* at *3.

[14]     *Id.*

[15]     *Id.* at *4.

[16]     *Id.* at *2.

[17]     *Peterson v. XPO Logistics, Inc.*, 812 Fed. App'x 754, 757 (10th Cir. 2020) ["*Peterson II*"].

In *Moss v. Parr Waddoups Brown Gee & Loveless*, 285 P.3d 1157, 1166 (Utah 2012), the Utah Supreme Court reaffirmed that Utah's judicial proceedings privilege is "intended to promote the integrity of the adjudicatory proceeding and its truth finding processes." *Id*. at 1166 (quoting *Pratt v. Nelson*, 164 P.3d 366, 381 (Utah 2007)). Both the Utah Supreme Court and the Tenth Circuit recognized that this privilege "protects participants in the judicial process from liability for statements made during an official proceeding." *Peterson II*, 812 Fed. App'x. at 756 (citing *Krouse v. Bower*, 20 P.3d 895, 898 (Utah 2001)); *see also Price v. Armour*, 949 P.2d 1251, 1256 (Utah 1997) ("The policy behind [the] privilege is to encourage full and candid participation in judicial proceedings by shielding the participant from potential liability for defamation.").

Nevertheless, in *Moss* the Utah Supreme Court determined that such protection is not absolute, and that there is an exception to the judicial proceedings privilege that can be triggered "where an attorney has committed fraud or otherwise acted in bad faith, which is inherently 'acting in a manner foreign to his duties as an attorney,' the privilege will not shield an attorney from civil liability." *Moss*, 285 P.3d at 1166 (citations and quotations omitted)

In *Peterson II*, the Tenth Circuit examined the *Moss* exception to the judicial proceedings privilege and determined that Mr. Peterson had pleaded facts suggesting that the opposing party either "committed fraud or otherwise acted in bad faith." *Peterson II*, 812 Fed. App'x at 758 (quoting *Moss*, 285 P.3d at 1166). Noting that the court must accept all well-pleaded facts as true and view them in

the light most favorable to the nonmoving party, the Tenth Circuit emphasized that Mr. Peterson had "point[ed] to several indicators showing that emails sent from XPO to Leeway were either fabricated or falsified" and that "[s]uch falsification of evidence, *if proven*, would surely amount to bad faith and would thus be sufficient to trigger the *Moss* exception." *Id.* at 758 & n.4.

Even though the *Moss* court mentioned only attorneys—not parties—when articulating the "fraud or bath faith exception," the Tenth Circuit reasoned that "[b]ecause the judicial proceedings privilege applies to all participants of the litigation, it follows that the 'fraud or bad faith' exception to the privilege should also apply to all participants." *Id.* at 759 (citing *Moss*, 285 P.3d at 1166). Thus, the Tenth Circuit determined that the *Moss* fraud or bad faith exception to the Utah judicial proceedings privilege applies not only to attorneys, but also to parties. *Id.* at 760.

In an overly broad conclusion, the Tenth Circuit announced that "we find that the emails underlying Peterson's claims against XPO are not privileged." *Id.* Of course, because discovery in the case had not occurred regarding the truth of the allegations of fraud or bad faith, the Tenth Circuit necessarily meant, as it had stated in other portions of its decision,[18] that if the allegations of fabrication could be proven the publication of the Subject Emails would not be privileged.

---

[18]    *See, e.g., id.* at 758 (concluding that "Peterson *pleaded* facts sufficient to show bad faith . . . . Because we conclude that the *allegedly* fabricated or falsified emails demonstrate bad faith, the *Moss* exception *would apply* regardless of whether the emails also constitute fraud.) (emphasis added).

After remand from the Tenth Circuit the Second Action was consolidated into the Initial Action.[19]  Discovery was completed, and the parties filed their respective motions for summary judgment.

**LEGAL STANDARD**

Summary judgment may be granted when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  Once that initial burden has been met the nonmoving party must demonstrate the existence of specific material facts in dispute to survive summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th 2013) (citations omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material fact*."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  A

---

[19]    *See* ECF No. 247.

material factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In resolving a motion for summary judgment, the court views "the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008) (citation omitted). Despite this indulgence, the nonmoving party must nevertheless "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (*citing Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)). The mere existence of a scintilla of evidence in support of the nonmoving party's case is insufficient. *Anderson*, 477 U.S. at 252.

Moreover, the nonmoving party's evidence must be more than "'mere reargument of [his] case or a denial of an opponent's allegation' or it will be disregarded." *See Millennium, Inc. v. Sai Denver M, Inc.*, No. 14-cv-01118, 2015 WL 1816479, at *3 (D. Colo. Apr. 20, 2015) (quoting 10B Charles Alan Wright, *et al.*, FEDERAL PRACTICE AND PROCEDURE § 2738 at 356 (3d ed.1998)). Further, the court is not obligated to comb the record in order to make a party's arguments. *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000). And where the moving party bears the burden of proof at trial, summary judgment on such an issue is only available when the party has made a showing "sufficient for the court

to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quotation omitted).

"Additionally, the existence of a privilege is a question of law for the court." *Riddle v. Perry*, 40 P.3d 1128, 1131 (Utah 2002) (internal quotation omitted).[20]  And whether a statement is conditionally privileged remains a question of law, "unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defendant acted with malice."  *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 58 (Utah 1991).  And where, as here, the court will be ruling on cross-motions for summary judgment, the court will evaluate each party's own motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.  *See Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000); *Morden v. XL Specialty Ins.*, 177 F. Supp. 3d 1320, 1326 (D. Utah 2016), aff'd in part, rev'd in part and remanded, 903 F.3d 1145 (10th Cir. 2018).

## UNDISPUTED FACTS[21]

1. Although Mr. Peterson alleged in his complaint that "XPO composed the Forged Email and Forged Reply and caused them to be sent to counsel for Leeway for the purpose of injuring Mr. Peterson and benefiting XPO,"[22] he has

---

[20]    *See also DeBry v. Godbe*, 992 P.2d 979, 982 (Utah 1999) (noting that whether a privilege applies "is an issue of law we review for correctness") (citing *Price v. Armour*, 949 P.2d 1251, 1254 (Utah 1997)).

[21]    These facts were identified in the parties' briefing and related submissions.

[22]    *See* Def's Mot., Ex. A, ECF No. 248-2 at ¶25.

acknowledged that he "does not possess sufficient knowledge to determine with precision who created the [Subject Emails]."[23]

2. And although Mr. Peterson denied that XPO held a good faith belief that the Subject Emails were authentic, he similarly acknowledged that he "does not possess sufficient knowledge to determine what XPO's belief was as to the [Subject Emails]."[24]

3. Indeed, during his deposition Mr. Peterson was still unable to provide any factual basis for his allegation that XPO created or fabricated the Subject Emails, and alleged only that fact discovery would reveal the identity of the creator of the Subject Emails or otherwise demonstrate that XPO employee Tim Thomas created them.[25]

4. XPO presented evidence that the Subject Emails were sent from an IP address in the Dallas-Fort Worth, Texas area, and Mr. Peterson has conceded that Mr. Thomas was not in Texas on the date the Subject Emails were sent, and that this was no longer a purported factual basis for his allegation.[26]

5. There is no forensic evidence to support that XPO created the Subject Emails.[27]

**Receipt of the Subject Emails**

6. The Subject Emails arrived in XPO's Microsoft Office 365 email address for

---

[23]    *See* Def's Mot., Ex. E, ECF No. 248-6 at 6 [Pl's Response to Def's RFA no. 2].

[24]    *See id.* [XPO's response to RFA no. 4].

[25]    *Id.* at 36 (citing ECF No. 248-7 at 36 [Peterson Dep. at 271:9-15]).

[26]    Def's Mot., Ex. F, ECF No. 248-7 at 36 [Peterson Dep. at 270:17-20].

[27]    Def's Mot., Ex. I, ECF No. 248-10 at 8 [Expert Report of A. Reisman at 7].

former employee Casey McKell, Casey.mckell@xpo.com, on April 19, 2016, at 7:06:20 PDT.[28]

7.  The Subject Emails appear to reference Mr. Peterson discussing plans regarding shipments with XPO's customer Hanjin, as well as coordination by Mr. Peterson with a current XPO employee to join Leeway after departing XPO.[29]

8.  The Subject Emails were received from IP Address 209.85.218.65, from a Google Gmail account entitled "josh.morin.track.dock@gmail.com."[30]

9.  The Google Gmail account "josh.morin.track.dock@gmail.com" was created on April 16, 2019, at 13:14:00 UTC (or 5:14 am PDT), from IP Address 208.54.86.205.[31]

10. XPO only used the Exchange Only services hosted in Microsoft's Office 365 environment for email hosting, service, and transmission during the relevant period.[32]

11. XPO did not use Google Gmail accounts to conduct business.[33]

12. Mr. Thomas received and reviewed the Subject Emails while in XPO's Kansas

---

[28]    Def's Mot., Ex. G, ECF No. 248-8 at 4 [XPO's Ans. to Interrog. No. 1]; Ex. H, ECF No. 248-9 at 2 [copy of Subject Emails]; Ex. I, ECF No, 248-10 at 3–4 [Expert Report of A. Reisman]; Ex. J., ECF No. 248-11 at 6 [XPO's Ans. to Interrog. No. 22].

[29]    *See* Def's Mot., Ex. H, ECF No. 248-9 at 2.

[30]    Def's Mot., Ex. J, ECF No. 248-11 at 4–5 [Def's Ans. to Interrog. No. 21]; Ex. I, ECF No. 248-10, at 3–4; Ex. H, ECF No. 248-9 at 2.

[31]    Def's Mot., Ex. J, ECF No. 248-11 at 4–5 [Def's Ans. to Interrog. No. 21]; Ex. I, ECF No. 248-10 at 3–4; Ex. K. ECF No. 248-12 at 5.

[32]    Def's Mot., Ex. J, ECF No. 248-11 at 6 [Def's Ans. to Interrog. No. 22].

[33]    *Id.*

City office pursuant to his supervision of Mr. McKell's XPO email inbox.[34]

13. On April 16, 2019, Mr. Thomas sent several other emails all of which originated from IP Address 169.254.6.96.[35]

14. No email sent by Mr. Thomas that day shared an IP Address with the Subject Emails.  Nor was the creation of the "josh.morin.track.dock@gmail.com" email address linked to Mr. Thomas or XPO.[36]

**Publication of the Subject Emails**

15. On April 29, 2016, Robert Smeltzer, outside retained counsel for XPO, sent an email to Christopher Von Maack and Geoff Biehn, outside counsel for Leeway, that imbedded the Subject Emails.[37]

16. No officer or employee at Leeway was copied on that email.

17. No officer or employee at XPO sent the Subject Emails to Leeway's counsel; rather, the Subject Emails were sent by Mr. Smeltzer, who was acting as XPO's outside retained counsel.

18. Mr. Seltzer identified the email with subject line: "XPO v. Leeway – Inadmissible FRE 408 Discussion."  He further notes that "Your immediate attention to this email is required."[38]

19. In characterizing the Subject Emails, Mr. Smeltzer informed Mr. Von Maack

---

[34]    Def's Mot., Ex. L, ECF No. 248-13 at 6 [Thomas Dep. at 43:16–17].

[35]    Def's Mot., Ex. J, ECF No. 248-11 at 4–5 [Def's Ans. to Interrog. No. 21].

[36]    *Id.*

[37]    Pl's Suppl. to Peterson's Cross-Motion for Summ. J., Ex. 8, ECF No. 259-1 at 3–7.

[38]    *Id.* at 3.

that they "unequivocally demonstrate[ ] that Leeway actively and knowingly interfered with Casey Ainsworth's contract and fiduciary duties as a then-current employee of XPO …."[39]

20. Mr. Smeltzer also recommended to Leeway's counsel that Leeway must quickly decide whether to, among other things, "fire" Mr. Peterson and others, "agree not to hire Ainsworth," and "agree not to solicit a significant subset of McKell, Peterson, Sudweeks and Ainsworth's customer lists."[40]

21. On May 2, 2016, Mr. Von Maack responded to Mr. Smeltzer's April 29, 2016, email. In his response he denied that Leeway did business with Hanjin and many other client references in Mr. Smeltzer's email. He then indicated that "LeeWay is investigating these issues," and asked Mr. Smeltzer to provide "all documents that you have on this subject in native format."[41]

22. Later that same day Mr. Smeltzer responded, noting, among other things, that that Mr. Peterson and others "are targeting both XPO's current customer (Hanjin), its employee (Ainsworth) and its information (via Ainsworth)." He also stated that he would get the native file to Mr. Von Maack "in due course, but I will assure you that I cut and pasted the entire email chain." He then informed Leeway's counsel that he was open to hearing "if you have some other

---

[39]     *Id*. at 5.

[40]     *Id*.

[41]     *Id*. at 2–3.

plausible explanation [for the Subject Emails] other than its plain meaning."[42]

23. Later that evening Leeway's counsel Mr. Von Maack wrote back seeking more foundation as to the Subject Emails, including an explanation on the following "factual inconsistencies":  why the ostensible reply was sent before the purported original email;  why the initial email incorrectly identifies April 19 as a Monday, despite the fact that April 19 was a Tuesday; and why the initial original email does not have any "To" or "Subject" lines, while the purported reply has both."  He further added that "So far, Leeway's investigation suggests that the e-mail is not authentic" noting that "[f]or instance, the [Subject Emails] thread does not appear in Leeway's servers."[43]

24. On May 3, 2016, Mr. Smeltzer responded indicating that:  "I will investigate the authenticity issues you raise immediately," but also noting that Mr. Peterson's email address on the Subject Emails "seems to be valid (because of the 'hyperlink') with two different spellings of leeway global logistics."[44]

25. On May 4, 2016, Mr. Smeltzer sent a copy of the original Subject Emails to Leeway's counsel.[45]  Mr. Smeltzer informed Leeway's counsel that he believed the Subject Emails were "authentic" and that "[a]ny header anomalies will have to be explained by Mr. Morin [the person identified as having written the reply

---

[42]    *Id.* at 2.

[43]    Def's Mot., Ex. C, ECF No. 248-4 at 4.

[44]    *Id.*

[45]    Leeway's Answer to Am. Compl., Ex. 2, ECF No. 191-2 at 4 [R. Smeltzer email to C. Von Maack].

portion of the Subject Emails], but I know that headers are editable once they are contained in a reply."[46]

**Employment Response to the Subject Emails**

26. On April 19, 2026, and immediately upon receipt of the Subject Emails, Tim Thomas of XPO wanted to terminate Casey Ainsworth's employment at XPO.[47]

27. Mr. Thomas forwarded the Subject Emails to others at XPO and to XPO's outside counsel Mr. Smeltzer, and held a conference call to discuss them.[48]

28. Mr. Ainsworth was XPO's "top performer."[49]

29. The very next day, April 20, 2016, Mr. Ainsworth was fired by XPO because of the Subject Emails, a decision that harmed XPO and left it with a diminished staff. [50]

30. XPO also fired Andrei Penagos, another valuable producer at XPO, because of the Subject Emails.[51]

---

[46] *Id.*

[47] Def's Mot., Ex. L, ECF No. 248-13 at 7 [Thomas Dep. at 48:10–12].

[48] *Id.* at 7, 9 [Thomas Dep. at 48:2–9; 54:5–14].

[49] *Id.* at 6 [Thomas Dep. at 45:23–25 ("He was my top performer. I like him a lot. He is a great guy.")]; Def's Mot., Ex. M, ECF No. 248-14 at 9 [Padilla Dep. at 67:11–22 ("And at that time [when the Subject Emails were received] Casey was our number one producer ....")].

[50] *Id.* at 18 [Thomas Dep. at 53:5-11]; Def's Mot., Ex. M, ECF No. 248-14, at 9 [Padilla Dep. at 67:16–22 (testifying that the firing of Mr. Ainsworth "would only hurt" XPO)].

[51] *Id.* at 14, 18 [Thomas Dep. at 89:19-90:8; 107:13–108:6 (testifying he also fired Andre Penagos on April 20 due to the Subject Emails also)]; *see also* Def's Mot., Ex. M, ECF No. 248-14 at 12 [Padilla Dep. at 83:14–16 (testifying that Andre Penagos was also a top producer at XPO)].

31. Similarly, on May 2, 2016, the next business day after receiving the Subject Emails from Mr. Smeltzer, and because of the Subject Emails, Leeway fired Mr. Peterson.[52]

32. Whitt Lee of Leeway, who fired Mr. Peterson, testified that when he fired Mr. Peterson on May 2, 2026, he did not believe the Subject Emails were a forgery.[53]

**Subjective belief in the Subject Emails**

33. Mr. Thomas testified that he believed the substance of the Subject Emails to be true and identified four separate truths in the Subject Emails indicating their authenticity.[54]

34. The reference in the Subject Emails to a "Friday" conversation between Josh Morin and Mr. Ainsworth rang true and "jumped out" to Mr. Thomas because he recalled that Mr. Ainsworth was gone on that Friday "longer than expected."[55]

35. A reference in the Subject Emails that the "new BP [Thomas] bonused him [Ainsworth] $30,000" also rang true because Mr. Thomas had verbally agreed to "compensate him for like $30,000 of margin," which was ultimately paid to Mr.

---

[52]    Def's Mot., Ex. O, ECF No. 248-16 at 12, 17 [Lee Dep. at 39:25–40:1; 57:25–58:11; 59:12-22]; *see also* Pl's Opp'n to Summ. J., ECF No. 249 at 27–28 (asserting that the Subject Emails were the "but for" cause of Mr. Peterson's termination and stating that arguing that "Peterson was fired due to the [Subject Emails]").

[53]    *Id*. at 18 [Lee Dep. at 62:2–6 ( Q.  Did you believe that the email was not real when 3 you terminated Mr. Peterson? A. No, I did not believe it was -- I didn't know what to believe, but I didn't know it was a forgery at the time.")].

[54]    Def's Mot., Ex. L, ECF No. 248-13 at 6, 17 [Thomas Dep. at 45:5–14; 48:19–49:17; 49:18–25; 50:16–23; 51:3–21; 104:17–24].

[55]    *Id*. at 7 [Thomas Dep. at 48:22–49:17].

Ainsworth.[56]

36. The Subject Emails also referenced an effort to assign Mr. Ainsworth to work on a Campbell's Soup account that XPO hoped to land, and which Mr. Ainsworth would run.[57]

37. And the Subject Emails reference to the need for a tracking application for Hanjin also rang true for Mr. Thomas because Hanjin involved the shipping of Xboxes, which would need a tracking application.[58]

38. On the same date he received the Subject Emails Mr. Thomas contacted Gil Padilla, a fellow XPO employee, and discussed the Subject Emails with him.[59]

39. Although Mr. Padilla opined that the Subject Emails, "sounded too good to be true," Mr. Thomas still believed the Subject Emails to be authentic and true.[60]

40. Mr. Padilla testified that the Subject Emails contained relevant information, and "that to me seems like somebody intentionally sent it to XPO or wanted it to get in XPO's hands."[61]

41. Mr. Padilla testified that at the time he learned of the Subject Emails he was

---

[56]    *Id*. at 8 [Thomas Dep at 51:3–21].

[57]    *Id*. at 7 [Thomas Dep at 49:18–25].

[58]    *Id*. at 8 [Thomas Dep. at 50:16–23].

[59]    *Id*. at 10 [Thomas Dep. at 60:10–61:4]; Def's Mot., Ex. M, ECF No. 248-14 at 8–9 [Padilla Dep. at 65:5–66:7].

[60]    Def's Mot., Ex. M, ECF No. 248-14 at 9 [Padilla Dep. at 66:4–5 ("Q. And did you – did he believe it?  A. Yes, he did.); 69:4-7 ("Q. Did Mr. Thomas ever change in his firm belief that that email was absolutely true?  A. He did not.")].

[61]    *Id*. at 12 [Padilla Dep. at 69:4–14].

already suspicious that Hanjin-related work that was previously handled by XPO was now being handled by Leeway in violation of Josh Morin's noncompete.[62]

42. Mr. Padilla further testified that when he was shown the Subject Emails, he believed they were "legitimate emails" and that he told someone that "they seemed accurate because at the time we were no longer doing business with Hanjin and it would make sense that someone else was doing business with Hanjin. And Josh Morin had the knowledge to take the Hanjin business elsewhere and we had fired him."[63]

43. Although Mr. Padilla also testified that despite these accuracies in the Subject Emails, he still "had my significant doubts that I shared with Tim Thomas," but, at the same time, he "wouldn't have put it past me to pass the [Subject Emails] along to XPO's legal counsel … if that makes any sense."[64]

44. He also testified that after reading the Subject Emails he advised Mr. Thomas that he thought they were "100 percent fraudulent" and to "proceed with caution."[65]

45. Nevertheless, Mr. Thomas believed he had a duty to advise XPO's HR and

---

[62]    *Id*. at 12 [Padilla Dep. at 82:3–21].

[63]    *Id*. at 12 [Padilla Dep. at 82:24–85:11].

[64]    *Id*. at 12 [Padilla Dep. at 85:12–16].

[65]    *Id*. at 9 [Padilla Dep. at 67:11–22].

other decision makers at XPO that he had received the Subject Emails.[66]

46. After being contacted by Mr. Thomas, Robert Lackey, an HR manager at XPO, wrote to Mr. Thomas to say that "The e-mail does appear a bit contrived, but why would they say those types of things to harm a potential employee and son of an investor for Morin's venture?"[67]

47. Mr. Thomas testified that even though Mr. Lackey felt that the Subject Emails appeared a bit contrived, he "absolutely" continued to believe that the Subject Emails were authentic.[68]

48. Despite thinking that something about the Subject Emails didn't "make sense," Mr. Thomas did not have any doubt that the Subject Emails were in fact what they appeared to be and that they had to be shown to Leeway.[69]

49. Further, in response to an interrogatory, XPO answered that "[t]he contents of the [Subject Emails] were consistent with XPO's ongoing investigation into Mr. Peterson's breaches of implied, express, and fiduciary or employment duties, as well as his employment contract."[70]

50. It was weeks or months after receiving the Subject Emails that XPO's outside attorney, Mr. Smeltzer, informed Mr. Thomas that someone questioned the

---

[66]    Def's Mot., Ex. L, ECF No. 248-13 at 14 [Thomas Dep. at 82:20–89:10].

[67]    *Id*. at 17 [Thomas Dep. at 103:22–104:4].

[68]    *Id*. at 18 [Thomas Dep. at 105:25–106:12].

[69]    *Id*. at 13 [Thomas Dep. at 86:11–87:9].

[70]    Pl's Mem. in Opp'n to Summ. J., Ex, 15, ECF No. 249-16 at 5 [Def's Answers and Responses].

authenticity of the Subject Emails,[71] but this was only after Mr. Thomas had fired two of his top employees due to his belief in the authenticity of the Subject Emails.[72]

51. And while Leeway's attorney initially raised questions of authenticity of the Subject Emails on May 2, 2016, including asking why the reply was sent before the purported initial e-mail; why the initial e-mail incorrectly identifies April 19 as a Monday, despite the fact that April 19 was a Tuesday; and why the initial original e-mail does not have any "To" or "Subject" lines, while the purported reply has both,[73] Leeway still went ahead and terminated Mr. Peterson's employment.

52. Mr. Lee testified that when he fired Mr. Peterson on May 2, 2016, he did not believe the Subject Emails were a forgery.[74]

53. Indeed, it wasn't until five days after Mr. Peterson was terminated, which was eight days after Leeway first received the Subject Emails, that Leeway's counsel wrote to Mr. Peterson to inform him that they although they "feel the [Subject Emails] was a forgery, Smeltzer [XPO's outside attorney] apparently does not."[75]

---

[71]    Def's Mot., Ex. L, ECF No. 248-13 at 14 [Thomas Dep. at 91:21–25; 92:1–23].

[72]    *Id*. at 6–7, 11, 18 [Thomas Dep. at 45:21–25; 46:1–11; 48:1–21; 64:5–17; 107:13–25].

[73]    Def's Mot., Ex. C, ECF No. 248-4 at 4.

[74]    Def's Mot., Ex. O, ECF No. 248-16 at 18 [Lee Dep. at 62:2–6 ( Q.  Did you believe that the email was not real when you terminated Mr. Peterson?  A. No, I did not believe it was -- I didn't know what to believe, but I didn't know it was a forgery at the time.")].

[75]    *Id*. at 17-18 [Lee Dep. at 61:20–62:10].

54. XPO had a discovery obligation to identify, retain, and produce the Subject Email. Specifically, Leeway's First Set of Requests for Production of Documents included requests to produce all documents "referencing LeeWay," and documents "regarding ProPac, Hanjin … and any other XPO customer purportedly contacted by the Subject Employees in violation of their nonsolicitation [sic] provisions."[76]

**Mr. Peterson's Alleged Termination**

55. Mr. Peterson had been hired by Whit Lee of Leeway in July of 2015.[77]

56. On May 2, 2016, Leeway was aware that the Subject Emails contained inconsistencies.[78]

57. Nevertheless, Leeway, through Mr. Lee, terminated Mr. Peterson's position that same day.[79]

58. Mr. Lee considered rehiring Mr. Peterson as an independent agent within five days of his termination.[80]

59. Mr. Peterson declined the offer.[81]

---

[76]  Def's Reply Br., Ex. 2, ECF No. 251-2 at 3–4 [Requests Nos. 4 & 7].

[77]  Def's Mot., Ex. O, ECF No. 248-16 at 5 [Lee Dep. at 11:14–25; 12:1–9].

[78]  *Id.* at 18 [Lee Dep. at 63:19–25]; Def's Mot., Ex. C., ECF No. 248-4 at 4.

[79]  Def's Mot., Ex. D, ECF No. 248-5 at 3.

[80]  Def's Mot., Ex. O, ECF No. 248-16 at 18 [Lee Dep. at 63:1–6].

[81]  *See* Def's Mot., Ex. F, ECF No. 248-7 at 8 [Peterson Dep. at 72:2–73:4].

## ANALYSIS

### I.    Did the Judicial Proceedings Privilege Attach to the Subject Emails

Under Utah law, the judicial proceedings privilege applies to statements that were: "(1) made during or in the course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding; and (3) be made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." *Peterson II*, 812 Fed. App'x at 756–57 (cleaned up).  There is no dispute in this action that, absent some exception, the judicial proceedings privilege would otherwise attach to XPO's counsel's presentation of the Subject Emails and, in turn, protect XPO and its counsel from liability from Mr. Peterson's asserted claims and counterclaims.

As recognized by the Tenth Circuit and acknowledged by the parties the only potentially applicable exception to the privilege is the so-called *Moss* exception.  *See Peterson II*, 812 Fed. App'x. at 757.  As noted previously, in *Moss* the Utah Supreme Court held that the judicial proceedings privilege will not apply "where an attorney has committed fraud or otherwise acted in bad faith, which is inherently 'acting in a manner foreign to his duties as an attorney.'" *Moss*, 285 P.3d at 1166 (citations and quotations omitted).

Because this issue is presented in the context of competing summary judgment motions, it was first incumbent on XPO to establish that the judicial proceedings privilege applies.  As noted, it has done so.  It was then Mr. Peterson's burden to rebut the application of the privilege with a showing that the *Moss* exception applies.  *Cf. Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 904–05

(Utah 1992) (recognizing that when a plaintiff at summary judgment seeks to overcome a defamation privilege, the plaintiff must establish that the allegedly slanderous or libelous statements were made with the "requisite level of fault") (citing *Ogden Bus Lines v. KSL, Inc.*, 551 P.2d 222, 225 (Utah 1976) (quoting *Direct Import Buyers Ass'n v. KSL, Inc.*, 538 P.2d 1040, 1042 (Utah 1975))); *see also Ferguson v. Williams & Hunt, Inc.*, 221 P.3d 205, 215 (Utah 2009) (recognizing that to prove abuse of a conditional defamation privilege plaintiff must present sufficient evidence that defendant acted with the necessary level of fault). Further, the determination as to whether the requisite level of fault has been established is a question of law. *See Russell*, 842 P.2d at 905 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990)). The question then is: Has Mr. Peterson proffered enough evidence sufficient to warrant application of the *Moss* exception? The court finds that he has not.[82]

### A. Mr. Peterson Has Not Established that the Moss Exception Applies

#### 1) Mr. Peterson Lacks Support Under a Fraud/Fabrication Theory

As to the initial concern expressed by the Tenth Circuit in *Peterson II*, there can be no dispute that Mr. Peterson has not marshalled any evidence, let alone any sufficient evidence that XPO or its attorney "fabricated or falsified" the Subject

---

[82]    In reaching this determination, the court remained cognizant that Mr. Peterson was not required, at this stage of the action, to actually prove that XPO or its attorney committed fraud or acted with the requisite bad faith required to invoke the *Moss* exemption; rather, Mr. Peterson only needed to proffer evidence sufficient to support a jury's finding that they acted in such a manner. As discussed herein, the court determines that Mr. Peterson has failed to do so.

Emails.  *See Peterson II*, 812 Fed. App'x at 758 (acknowledging that Peterson's allegation "if proven, would surely amount to bad faith and would thus be sufficient to trigger the Moss exception").[83]  In fact, Mr. Peterson has acknowledged that he has no such evidence to proffer.[84]

In its ruling in *Peterson II*, the Tenth Circuit rightfully focused on Mr. Peterson's allegations that XPO "fabricated or falsified" the Subject Emails. Although in his pleadings Mr. Peterson repeatedly claimed that XPO employees forged, fabricated, or manufactured the Subject Emails,[85] he has not come forward with any evidence to support those allegations.

2)  Has Mr. Peterson Presented Support Under a "Bad Faith" Theory?

At best, what Mr. Peterson has presented is evidence that there were several anomalies in the Subject Emails.  In *Peterson I* the court identified these inconsistencies:

> Although [the Subject Emails] superficially appear to be real emails in a regular email format, the date on the emails state Monday, April 19, 2016, when in fact April 19, 2016, was a Tuesday.  The email address for Peterson is also inconsistent in the original email and the reply, which the computer should have automatically generated to go to the same email address from which the original email was sent.  In addition, the reply email appears to have been sent hours before the original email.

---

[83]    Notably, the Tenth Circuit did not discuss whether the existence of doubt as to the authenticity of the Subject Emails would similarly trigger the *Moss* exception.

[84]    *See* Def's Mot., Ex. E, ECF No. 248-6, at 6 [Pl's Response to Def's RFA No. 2]; Def's Mot., Ex. F, ECF No. 248-7 at 36 [Peterson Dep. at 271:9–15].

[85]    *See* Case No. 2:15-cv-703, ECF No. 193 [Peterson Counterclaim] at ¶¶23–25, 53; Case No. 2:17-cv-307, ECF No. 2 [Peterson Complaint] at ¶¶23–25,45, 54, 69.

*Peterson I,* 2017 WL 5054706, at *2; *see also Peterson II*, 812 Fed. App'x at 756.

There is no doubt that there were inconsistencies in the header of the Subject Emails and that Mr. Peterson has presented evidence that some XPO employees were aware of them. Some even raised concerns as to the authenticity of the Subject Emails. What Mr. Peterson has not presented, however, is evidence that links knowledge of these inconsistencies to the bad faith necessary to satisfy the *Moss* exception.

### a) What is the "Bad Faith" that is Required?

It is important to note the procedural posture in *Moss*. *Moss* concerned a motion for judgment on the pleadings—the court was tasked only with examining the contours of the allegations and the answer. *See Moss*, 285 P.3d at 1160 & n.5. The Utah Supreme Court was not tasked with determining whether there was any evidentiary support to overcome application of the judicial proceedings privilege.

Moreover, the *Moss* decision addressed application of the judicial proceedings privilege to conduct and not to statements. *See id*. at 1164–66. The acts at issue in *Moss* concerned those of an attorney with the defendant law firm, who along with a sheriff's deputy, attempted to execute a discovery order in an effort to gather electronic storage media from plaintiffs' home. *Id*. at 1160–61. When one of the plaintiffs refused to abide by the order, the attorney procured a second supplemental order that directed the sheriff to enter the home and search for and gather the materials, and to detain anyone who resisted enforcement of the order. *Id*. at 1161. The attorney then returned to the home armed with the supplemental

order and, together with the sheriff, entered the home and removed the storage media covered under the order.  *Id*.

Plaintiffs sued the defendant law firm asserting six different tort claims, each of which relied on plaintiffs' allegations that the search that was conducted was illegal under the Utah and U.S. Constitutions.  *Id*. at 1161–62.

Relying on *res judicata* grounds, the trial court granted judgment on the pleadings for the defendant.  The court merely mentioned in passing that the defendants were operating "within the framework" of the judicial proceedings privilege.  *See Moss v. Parr, Waddoups, Brown, Gee & Loveless*, No. 050913371, 2007 WL 7320028 (Utah Dist. Ct. Mar. 28, 2007).  The Utah Court of Appeals affirmed on collateral estoppel grounds.  It did not mention any judicial proceedings privilege.  *See Moss v. Parr Waddoups Brown Gee & Loveless*, 237 P.3d 899, 902 (Utah Ct. App. 2010).

Despite recognizing that the two lower courts did not rely on the judicial proceedings privilege in their rulings, the Utah Supreme Court affirmed the judgment solely based on judicial proceedings privilege.  *See Moss*, 285 P.3d at 1164–68.

In so doing the *Moss* court recognized a number of actions that an attorney might take that would cause the privilege to be lost.  *Id*. at 1166.  Relying on a decision from the Supreme Court of Idaho, the *Moss* court backed away from the longstanding absolute nature of the judicial proceedings privilege in Utah and recognized that it was "not without limits."  *Id*. (citing *Taylor v. McNichols*, 243

P.3d 642, 657 (Idaho 2010)).[86]

Among other things, the *Moss* court noted the privilege does not extend its protective shield if "the attorney has committed fraud or otherwise acted in bad faith, which is inherently 'acting in a manner foreign to his duties as an attorney.'" *Id.* (quoting *Taylor*, 243 P.3d at 656).[87]  More specifically, the court explained that "to overcome the judicial proceedings privilege, the [plaintiffs] must allege that [defendant's attorneys] acted fraudulently, outside the scope of representing [their client], or otherwise in their own interest."  *Moss*, 285 P.3d at 1166 n.3.

That was the only form of bad faith acknowledged in *Moss*.

### i.)    Whose "bad faith" should be examined?

In *Peterson II*, the Tenth Circuit did not directly address who actually transmitted the Subject Emails to Leeway in determining the contours of the judicial proceedings privilege.  In one sentence at the start of its decision the court suggests that "XPO transmitted" the Subject Emails.  *See Peterson II*, 812 F.3d. at 755.  But four paragraphs later the court notes that Mr. Peterson's claims arise

---

[86]    In *Taylor* the Idaho Supreme Court only recognized an exception to the privilege in an action "where <u>an attorney</u> is sued by the current or former adversary of his client…." *Taylor*, 243 P.3d at 657 (emphasis added).  The court notably did not apply or discuss if an exception would be available in an action against a litigant, even though it recognized that the privilege also applies to "litigants."  *Id.* at 652.  That *Taylor* was so confined gives further support to the argument raised by Judge Briscoe in her dissent in *Peterson II* where he questioned whether it was even appropriate to apply the *Moss* exception to a litigant. *See infra* note 94; *Peterson II*, 812 Fed. App'x at 762 (Briscoe, J., dissenting).

[87]    Notably, *Moss* did not concern any allegedly defamatory or false statements.  The asserted claims were abuse of process, civil conspiracy, trespass, invasion of privacy, intentional infliction of emotional distress, and conversion.  *See* 237 P.3d at 899.

from "the publication of the [Subject Emails] by XPO's attorneys." *Id*. at 756

After carefully reviewing the pleadings and the briefs and supporting materials submitted by the parties, there is no dispute that the only publication of the Subject Emails that is potentially actionable was the publication by Mr. Smeltzer, XPO's outside counsel, when he sent them to Leeway's counsel on April 29, 2016. There is no record evidence presented by Mr. Peterson that XPO separately transmitted the Subject Emails to Leeway in any other circumstances.

Given that undisputed fact, it appears that to the extent the court should examine the application of the judicial proceedings privilege and any exceptions to it, it must be from the perspective of the person or party that actually published the allegedly wrongful statement. Here that person—who is not a party to this action— is Mr. Smeltzer, XPO's outside attorney. Particularly where it concerns defamation and where, as here, XPO is a corporate entity rather than an individual, the question is whether the individual responsible for the statement's publication acted with the requisite culpable state of mind. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 287 (1964) (noting that "the state of mind required for actual malice would have to be brought home to the persons in the ... organization having responsibility for the publication"). Thus, because Mr. Smeltzer was responsible for the publication of the Subject Emails arguably the focus on the *Moss* exception bad faith analysis should be on his state of mind or conduct. *Cf. Sullivan*, 376 U.S. at 287.

But in both *Peterson I* and *Peterson II* it appears the court examined the potential application of the *Moss* exception by reviewing either the conduct of XPO

or the claims asserted against XPO.  Neither court considered (or was asked to consider) whether the bad faith required for the *Moss* exception should be determined by examining the conduct of the actual publisher of the Subject Emails (Mr. Smeltzer) or whether the court should examine XPO's conduct in connection with the Subject Emails.[88]

In fact, even Mr. Peterson recognizes that at some level it is Mr. Smeltzer's conduct that primarily should be examined.  For example, in his Cross-Motion for Summary Judgment he argues that "it was at minimum negligent for Smeltzer, and by extension, XPO to send the emails, after [Smeltzer] had been put on notice that the emails appeared to be false."[89]

Assuming that it is only Mr. Smeltzer's conduct that should be reviewed in making a bad faith determination, it is plain the Mr. Peterson is unable to establish that Mr. Smeltzer acted in bad faith as required under *Moss*.

Mr. Peterson has not presented any evidence sufficient to establish that Mr. Smeltzer, when presenting the Subject Emails to Leeway, was acting fraudulently or was acting outside the scope of representing XPO or acting in his own interest. *Cf. Moss*, 285 P.3d at 1166.  There is no dispute that Subject Emails were received

---

[88]    One argument for examining XPO's conduct could be based upon on an agency theory.  If Mr. Smeltzer was an agent of XPO then presumably the statements and publications he made in furtherance of that agency could be attributable to XPO.  But Mr. Peterson has not asserted or argued for application of any such theory.  Another basis could be under a theory of *respondeat superior*.  Again, however, Mr. Peterson has not alleged or argued that such a theory links Mr. Smeltzer's statements and publications to XPO.

[89]    Pl's Mot., ECF No. 250 at 13.

by XPO on April 19, 2016.  There is also no dispute that soon thereafter Mr.

Smeltzer presented Leeway with a reproduction of the Subject Emails in connection

with settlement negotiations between XPO and Leeway in the underlying action.

And there is no dispute that the Subject Emails, even with their inaccuracies, were

documents that were responsive to discovery requests in the underlying action.[90]

In *Peterson II* the Tenth Circuit was justly concerned with the allegations

that XPO may have forged or fabricated the emails.  But Mr. Peterson has not

presented any record evidence to support that claim.  And he has certainly not

presented any evidence to support that Mr. Smeltzer fabricated the Subject Emails.

Nor has he presented sufficient evidence to establish that Mr. Smeltzer was

subjectively aware that the Subject Emails were a fake.

At most, the record establishes that that while some inconsistencies in the

Subject Emails header were identified and some may have been shared with Mr.

Smeltzer (many of them after he had published the Subject Emails), there were no

inconsistencies identified in the body of the Subject Emails.[91]  The record also shows

---

[90]    *See* Def's Reply Br., Ex. 2, ECF No. 251-2, at 3–4 [Requests Nos. 4 & 7].  At oral argument Mr. Peterson's counsel suggested that despite the facial relevance of the Subject Emails to discovery requests served in the underlying action, XPO should never have disclosed the Subject Emails to Leeway given the inconsistencies in the Subject Emails.  Counsel, however, did not offer any authority for that position and the court is unaware of any.  Moreover, by producing the Subject Emails to Leeway XPO ran a great risk, as courts have issued terminating sanctions on parties that have proffered fabricated documents.  *See, e.g., Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1180 (10th Cir. 2009) (affirming dismissal of plaintiff's action with prejudice due to her production of fabricated discovery documents).

[91]    As previously noted, the inconsistencies relate to dates, timing, and addresses found in the headings of the Subject Emails; there is no allegation that XPO identified inconsistencies or falsehoods within the body of the Subject Emails.  To the contrary, the only evidence in the record is that Mr. Thomas at XPO found the body of the Subject Emails

that Leeway's counsel informed Mr. Peterson that Mr. Smeltzer believed the
Subject Emails to be "authentic."[92]  Mr. Smeltzer also told Leeway that "[a]ny
header anomalies will have to be explained by Mr. Morin [the person identified as
having written the reply portion of the Subject Emails], but I know that headers are
editable once they are contained in a reply."[93]

Simply put, there is nothing in this litany of Mr. Smeltzer's conduct or
statements that could support a jury's determination that when he presented the
Subject Emails to Leeway, Mr. Smeltzer was acting in a manner other than to serve
XPO's interests or in a manner foreign to his duties as an attorney.  *See Moss*, 285
P.3d at 1166.  Thus, if the examination for fraud or bad faith required under *Moss*
begins and ends with Mr. Smeltzer's conduct and statements, there can be no doubt
that the judicial proceedings privilege still applies.

### ii.)    What "bad faith" is required for a litigant?

Although *Moss* noted that "bad faith" might bar application of the judicial
proceedings privilege, the "bad faith" it considered was not akin to simple
negligence, or ill will, or even actual malice.  Rather, the *Moss* court expressly
defined the necessary "bad faith" as "acting in a manner foreign to his duties as an
attorney."  *Moss*, 237 P.3d at 1166.

---

contained information that rang true to him so much so that it confirmed for him the
veracity of the Subject Emails even given the inconsistencies in the headers.

[92]    Leeway's Answer to Am. Compl., Ex. 2, ECF No. 191-2, at 4 [R. Smeltzer email to C.
Von Maack].

[93]    *Id.*

Application of that standard obviously makes sense when applied to an attorney but what does it mean if it is to be applied (or can be applied) to a litigant like XPO.[94]

So, assuming it is even appropriate to examine the bad faith of a litigant who was not the person who actually made the statement at issue, what then is the "bad faith" required to apply the *Moss* exception to such a litigant who seeks protection under the judicial proceedings privilege? The parties have not addressed this issue.

In the *Taylor* case on which *Moss* relied, the Idaho Supreme Court recognized that the "bad faith" required to avoid application of the privilege is the same "bad faith" required to establish a "malicious prosecution" claim. *See Taylor*, 243 P.3d at 656–67. Assuming that is an appropriate "bad faith" analogue, there are four elements to a malicious prosecution claim under Utah law: (1) that defendants initiated or procured the initiation of criminal proceedings against an innocent

---

[94]     The dissent in *Peterson II* questioned whether it was even appropriate to apply the *Moss* exception to a litigant. Although the dissent noted that the majority concluded that "limiting Moss's holding to attorneys 'rests on a distinction that makes no difference,'" the dissent wrote that the holding in *Moss* suggests otherwise:

> To be protected by the judicial proceedings privilege, an individual must be "acting in the capacity of judge, juror, witness, litigant, or counsel." *Krouse v. Bower*, 20 P.3d 895, 898 (Utah 2001) (emphasis added, quotations omitted). *Moss* explained that an attorney committing fraud or bad faith no longer acts in his capacity as an attorney, and therefore falls outside of the scope of the privilege, because he is "acting in a manner foreign to his duties as an attorney." 285 P.3d at 1166 (quotations omitted). *Moss's* narrow analysis of an exception to the privilege therefore cannot apply to all participants in the litigation, as the majority suggests. An attorney's duties to his client and to the court differ vastly from the duties of a party, and *Moss* provides no analysis of a party's duties or the ways in which a party could act outside of its capacity as a litigant.

*Peterson II*, 812 Fed. App'x at 762 (Briscoe, J., dissenting).

plaintiff; (2) that defendants did not have probable cause to initiate the prosecution; (3) that defendants initiated the proceedings primarily for a purpose other than that of bringing an offender to justice; and (4) that the proceedings terminated in favor of the accused. *See Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 156 (Utah 1991).

A claim of wrongful use of civil proceedings, an equivalent to the malicious prosecution claim, has similar requirements, most notably that a defendant is subject to liability for wrongful civil proceedings if he "acts without probable cause, <u>and</u> primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based…." *Gilbert v. Ince*, 981 P.2d 841, 845 (Utah 1999) (emphasis added and citations omitted). A person has "probable cause" in this context when he "reasonably believes in the existence of the facts upon which the claim is based." *Id.* at 845–46.

If that is the standard as applied to XPO, Mr. Peterson has failed to present sufficient evidence of this sort of "bad faith." As an initial matter, the record presented establishes that XPO "reasonably believed" the Subject Emails were what they purported to be when they were presented to Leeway. Notably, Mr. Thomas of XPO examined them and found that the statements made in the Subject Emails aligned with certain facts and therefore "rang true" to him. He also almost immediately fired two of his top employees in reliance on the authenticity of the Subject Emails. And Leeway also initially believed the Subject Emails and fired Mr. Peterson as a result of that belief.

Further, there is no sufficient record evidence to establish that XPO

presented the Subject Emails for some improper purpose.  Certainly Mr. Peterson

makes that argument, but at this stage he is required to do more.  His allegations

have to be backed by some evidence sufficient to support his claim.  He has not done

so.  Plaintiff's conclusory statements based on conjecture, speculation, or subjective

belief are not competent summary judgment evidence.  *See Bones*, 366 F.3d at 875.

And there is a complete absence of record evidence that XPO's presentation of

the Subject Emails—emails it was under a discovery obligation to produce—was

done "primarily for a purpose other than that of securing the proper adjudication of

the claim in which the proceedings are based."[95]

Thus, even assuming that a form of bad faith analogous to malicious

prosecution (other than outright fraud) could defeat the shield of the judicial

proceedings privilege as to a litigant like XPO, Mr. Peterson has not presented

evidence sufficient that a jury could make that determination.

Further, even assuming (although neither *Moss* nor *Peterson II*, support such

an application) that the bad faith necessary to overcome the judicial proceedings

privilege is akin to the same bad faith or malice required to overcome other

recognized conditional privileges, Mr. Peterson has not presented evidence

sufficient to support that conclusion.[96]

---

[95]    Notably, in *Moss* the court concluded that even it was claimed that the client "desired to misuse legal process to cause an illegal raid on plaintiffs' home," the privilege was not lost.  *Moss*, 285 P.3d at 1168.

[96]    On this point the court notes that Justice Durham was the author of *Moss*.  She was also the author of *Ferguson v. Williams & Hunt*, 221 P.3d 205 (Utah 2009), which was issued three years prior to *Moss*, and *Wayment v. Clear Channel Broadcasting, Inc.*, 116 P.3d 271 (Utah 2005), issued seven years before *Moss*.  In both *Ferguson* and *Wayment* the

Under Utah law it is recognized that a person may overcome a conditional privilege by establishing common law malice or actual malice. *See* MODEL UTAH JURY INSTRUCTIONS, SECOND EDITION ("MUJI 2D"), CV1608; *Ferguson v. Williams & Hunt*, 221 P.3d 205, 212—15 (Utah 2009).

For Mr. Peterson to prove abuse by "common law malice" he would have to establish that XPO "was motivated primarily by ill will and spite towards him, rather than some other reason." MUJI 2D, CV1608; *see Ferguson*, 221 P.3d at 214 (recognizing that showing of common law malice supports a finding of abuse of a conditional privilege). Mr. Peterson has not presented evidence sufficient to support a common law malice determination.

And to prove "actual malice," Mr. Peterson would have to establish that at the time XPO published the defamatory statements, XPO "had actual knowledge the statements were false or actually entertained serious doubts as to whether the statements were true." MUJI 2D, CV1611; *see Ferguson*, 221 P.3d at 215. The question under this malice standard is not whether a reasonable person would have known that the statements were false or entertained serious doubts about their truth, but whether XPO actually had such knowledge or doubts at the time of

---

Utah Supreme Court laid out the test for how a conditional or qualified privilege could be overcome by noting that actual malice, common law malice, and reckless disregard will suffice. *See Ferguson*, 221 P.3d at 212–16; *Wayment*, 116 P.3d at 288. Despite having authored both these opinions, Justice Durham did not cite to them or reference these tests for overcoming the judicial proceedings privilege in *Moss*. Thus, it appears that Utah Supreme Court does not deem the "bad faith" necessary to overcome the judicial proceedings privilege to be the equivalent of the malice and reckless disregard test required to overcome a conditional privilege. Nevertheless, the court will address these tests.

publication.  *See* MUJI 2D, CV1611; *Ferguson*, 221 P.3d at 215 (recognizing that "publisher's knowledge of the falsity of the statement is inherently subjective").

And as to whether XPO acted with reckless disregard that test too is "substantially subjective." *Ferguson*, 221 P.3d at 215.  This means that reckless disregard "is determined by a subjective inquiry as to the defendant's belief and an objective inquiry as the inherent improbability of or obvious doubt created by the facts." *Id.*

As discussed above, however, Mr. Peterson has not marshalled sufficient evidence sufficient for a jury to determine that XPO actually knew the Subject Emails were false or seriously doubted their truth.  While some at XPO voiced concerns that the Subject Emails appeared "too good to be true" or looked contrived, or even appeared "100% fraudulent," those same persons ultimately concluded that the Subject Emails also contained enough truths that they believed they were authentic and actually acted (detrimentally) in the belief that they were in fact authentic—*e.g.*, when XPO fired two of its top performers because of the Subject Emails.  *See Ferguson*, 221 P.3d at 216 (affirming conclusion that privilege was not abused where defendants relied on three sources of information that confirmed their belief that the statement was true and actually refunded $10,000 to a client based on their subjective belief in the statement).[97]

In his briefing Mr. Peterson also claims that XPO's failure to more fully

---

[97]     Moreover, it has been noted that "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false" and that "[o]nly the latter establishes reckless disregard" *See Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992)).

investigate the authenticity of the Subject Emails demonstrates XPO's bad faith.[98]

But he does not cite any authority for this position.  Moreover, his argument is that

by failing to more closely examine the Subject Emails, XPO was "negligent."[99]  But

negligence is never enough.  *See Ferguson*, 221 P.3d at 213 ("[M]ere negligence as to

falsity, being required for all actions of defamation, is no longer treated as sufficient

to amount to abuse of a conditional privilege.") (quoting RESTATEMENT (SECOND) OF

TORTS § 600 cmt. b.).  And, in any event, the Utah Supreme Court addressed a

similar argument in *Ferguson* and determined that even where there may be

questions about the adequacy of a defendant's investigation, and even where, in

hindsight, it appeared the defendant reached an erroneous conclusion, such will not

satisfy the standard to overcome a conditional privilege where plaintiff does not also

show that the defendant, at the time it made the statements, knew they were false

or acted with reckless disregard as their falsity.  *See Ferguson*, 221 P.3d at 216.  As

noted previously, Mr. Peterson has not come forward with sufficient evidence to

support such a determination.

Mr. Peterson also suggests that the privilege cannot stand because the

complete record now establishes that the Subject Emails were, in fact, inauthentic.

But such a hindsight evaluation is not supported by the law.  Moreover, application

of the judicial proceedings privilege would be wholly unnecessary if the Subject

Emails were true and authentic.  If the Subject Materials were true XPO would

---

[98]    *See* Pl's Reply, ECF No. 253 at 9.

[99]    *Id.*

have a complete and absolute defense to the claims Mr. Peterson asserts. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991) ("In this state, truth is an absolute defense to an action for defamation.") (citations omitted).[100] The privilege therefore serves to protect attorneys and litigants when the statements they offer in a connection with a judicial proceeding are in fact not true.

Accordingly, because the judicial proceedings privilege attached to the publication of the Subject emails and has not been overcome, Mr. Peterson's remaining claims of tortious interference, identity theft, and injurious falsehood— all of which rely on the publication of the Subject Emails in connection with this action—cannot stand.

## II. Even if the Judicial Proceedings Privilege Did Not Apply Mr. Peterson's Claims Would Still Fail

### A. Defamation & False Light

Mr. Peterson argues that he is entitled to summary judgment on his causes of action for defamation and false light, but those claims have already been dismissed. Mr. Peterson did not appeal Judge Kimball's decision dismissing the defamation claim, in which Judge Kimball held, as a matter of law, that the Subject Emails

---

[100] Mr. Petersons' asserted claims—defamation, tortious interference, false light, injurious falsehood, and identity theft—all rely on the predicate that the Subject Emails were forged or fabricated and included false and defamatory statements as to Mr. Peterson. If the Subject Emails were not forgeries or did not contain false and defamatory statements, XPO could not be liable on these claims regardless of applicability of any judicial proceedings privilege. *See, e.g.,* RESTATEMENT (SECOND) OF TORTS § 600 cmt d. (1977) ("If the defamatory matter turns out to be true, the publisher has a complete defense … even though he believed it to be false or acted in reckless disregard as to its truth or falsity.").

were not defamatory.[101]  In addition, on October 18, 2017, Mr. Peterson's counsel

conceded during oral argument before Judge Kimball that he had not stated a claim

for false light and agreed to the dismissal of that claim.  *See Peterson I*, 2017 WL

5054706, at *2 ("Peterson acknowledges that the false light claim does not state a

claim and, therefore, concedes to the claim's dismissal.").  Accordingly, the court will

not address these claims, which have already been dismissed or conceded.

To be sure, the court recognizes that it has authority to reconsider Judge

Kimball's rulings on the defamation claim until judgment has been entered.  *See*

Fed. R. Civ. P. 54(b) (stating that "any order or other decision, however designated,

that adjudicates fewer than all the claims or the rights and liabilities of fewer than

all the parties does not end the action as to any of the claims or parties and may be

revised at any time before the entry of a judgment adjudicating all the claims and

all the parties' rights and liabilities"); *see also Kennedy v. Lubar*, 273 F.3d 1293,

1299 (10th Cir. 2001) ("Although courts are often eager to avoid reconsideration of

questions once decided in the same proceeding, it is clear that all federal courts

retain power to reconsider if they wish.") (citation and internal quotation marks

omitted).[102]  Insofar as the defamation determination is concerned, the court

---

[101]     *Peterson II*, 812 Fed. App'x at 756 n.1.

[102]     "The law-of-the-case doctrine 'posits that when a court decides upon a rule of law,
that decision should continue to govern the same issues in subsequent stages in the same
case.'" *Choice Hospice, Inc. v. Axxess Tech. Sols., Inc.*, 125 F.4th 1000, 1011 n.9 (10th Cir.
2025) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)); *see also Entek GRB, LLC v.
Stull Ranches, LLC*, 840 F.3d 1239, 1241 (10th Cir. 2016) (noting that the law of the case
doctrine "preclud[es] the relitigation of issues ... resolved in prior proceedings in the same
court.") (citation omitted); *Kennedy*, 273 F.3d at 1298 ("The law of the case doctrine posits
that when a court decides upon a rule of law, that decision should continue to govern the

declines to do so.  And because Mr. Peterson conceded to dismissal of his false light claim, there is no decision to reconsider as to that claim.[103]

As discussed below, the dismissal of Mr. Peterson's defamation claim also impacts his tortious interference claim.

### B.    Tortious Interference

As Mr. Peterson correctly asserts, in order to recover damages for tortious interference with economic relations he must prove: (1) that XPO intentionally interfered with his existing or potential economic relations; (2) by improper means; (3) causing injury to him.[104]   Improper means has been described as "those actions that 'are contrary to law, such as violations of statutes, regulations, or recognized common-law rules,' or action that violate 'an established standard of a trade or profession.'"  *C.R. England v. Swift Transportation Co.*, 437 P.3d 343, 352 (Utah

---

same issues in subsequent stages in the same case" to "avoid reconsideration of matters once decided during the course of a single continuing lawsuit.") (cleaned up); *United States v. Webb*, 98 F.3d 585, 589 (10th Cir. 1996) (noting that because an issue was not appealed the district court's ruling became final and court did not err in declining to address it on remand); *United States v. Bell*, 988 F.2d 247, 250 (1st Cir.1993) ("The black letter rule governing this point is that a legal decision made at one stage of a civil or criminal case, unchallenged in a subsequent appeal despite the existence of ample opportunity to do so, becomes the law of the case for future stages of the same litigation, and the aggrieved party is deemed to have forfeited any right to challenge that particular decision at a subsequent date.") (citation omitted).  Because Mr. Peterson did not appeal Judge Kimball's ruling that there was "no basis for [his] defamation claim as a matter of law," *Peterson I*, 2017 WL 5054706, at *4, this court need not and will not revisit that ruling.

[103]    It is again worth noting that in his brief to the Tenth Circuit Mr. Peterson affirmatively stated that he was "not seeking reinstatement of his claims for defamation or false light and has therefore not directly included those claims in his analysis.  *See* Brief of Appellant Aaron Peterson, 2018 WL 1790531, at *13 n.3; *see supra* note 3.

[104]    *See* Pl's Mot., ECF No. 250, at 14 (cleaned up).

2019) (citation omitted).

The Utah Supreme Court has "been careful to limit the scope" of improper means to conduct that is "illegal or tortious in themselves." *Id.* at 353–54.[105] Requiring the improper conduct element "ensures that a party will not be found liable for engaging in conduct in which the party was legally entitled to engage." *See id.* at 352.

The question here than is whether Mr. Peterson introduced evidence sufficient to support a jury determination that XPO, through its attorney Mr. Smeltzer, interfered with his economic relations through some illegal or tortious means.

As argued by Mr. Peterson, it was XPO's use of the Subject Emails that entitles him to judgment on his remaining tort claim.[106] Thus, Mr. Peterson's tortious interference claim arises from the allegedly defamatory Subject Emails sent by XPO's counsel to Leeway.[107] Given that the court has found (a finding that Mr. Peterson did not challenge on appeal) that the Subject Emails were not defamatory

---

[105]    As described by the Utah Supreme Court, "[i]mproper means include violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood.  Means may also be improper or wrongful because they violate an established standard of a trade or profession."  *Overstock.com, Inc. v. SmartBargains, Inc.*, 192 P.3d 858, 864 (Utah 2008) (citing St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 201 (Utah 1991) (internal quotation marks and citations omitted)).

[106]    *See* Pl's Mot., ECF No. 250 at 15 (arguing that use of Subject Emails constituted defamation and identity theft to support his tortious interference claim); Pl's Reply, ECF No. 253 at 12 (noting that such use entitles him "as a matter of law" to judgment on his identity theft and injurious falsehood claims).

[107]    *See* Pl's Mot., ECF No. 250 at 15.

as a matter of law, there appears to be no "improper means" to support his tortious interference claim. *See, e.g., England Logistics, Inc. v. Kelle's Transp. Serv., LLC*, 559 P.3d 45, 57 (Utah App. 2024) (concluding that where tort claims purportedly supporting the improper means element had been rejected and not challenged on appeal "it necessarily follows that [defendant] did not engage in any independently illegal or tortious conduct" and thus "the improper means element was not satisfied"); *Eagle Air Med Corp. v. Sentinel Air. Med. Alliance, LLC*, No. 2:16-cv-176, 2019 WL 6879252, at *11 (D. Utah Dec. 17, 2019) (holding that tortious interference was extinguished because the defamation claim that formed the basis for it had been dismissed by the court); *see also Ferguson*, 221 P.3d at 216 (holding that where no defamation existed defendants employed no improper means); *Davidson v. Baird*, 438 P.3d 928, 945 (Utah App. 2019) (noting that where defamation claim found insufficient it cannot form basis for improper means element for tortious interference).

As discussed above, there is no dispute that XPO received the Subject Emails on its servers. Nor is there any genuine dispute that the Subject Emails were responsive to production requests served in this action. Thus, as a matter of law, it cannot be said that XPO's actions in having its outside counsel send the Subject Emails to Leeway was an "improper means." *See C.R. England*, 437 P.3d at 354 (noting that "a person is not liable for intentional interference where the person engaged only in conduct in which he or she was legally entitled to engage"). There is nothing in XPO's counsel's conduct in sending the Subject Emails that violated

any statute, regulation, or recognized common-law rules, or that violated any law or industry standard.[108]

Accordingly, XPO is entitled to summary judgment as to Mr. Peterson's tortious interference claim.[109]

## C.   Identity Theft

Mr. Peterson acknowledges that in order to establish a private cause of action for identity theft under Utah law he must prove, among other things, that XPO "knowingly or intentionally" used, or attempted to use his "personal identifying

---

[108]   In his briefing, Mr. Peterson also argued that in light of some questions concerning the legitimacy of the Subject Emails, XPO's counsel's production of the Subject Emails was in violation of his "ethical obligation of candor." *See* Pl's Mot., ECF No. 250 at 15.  Notably, Mr. Peterson did not cite to any specific rule of conduct.  It appears that Utah Rule of Professional Conduct 3.3(b) might be the most applicable.  Under that standard, "[a] lawyer shall not offer evidence that the lawyer knows to be false.  If a lawyer, the lawyer's client or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."  UTAH R. PROF'L CONDUCT 3.3(b).  The comments to Rule 3.3, however, note that "[t]he prohibition against offering false evidence only applies if the lawyer knows that the evidence is false.  A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact."  *Id*. 3.3 cmt. 8.  As discussed above, and even assuming that a violation of this ethical duty could support the improper means element, Mr. Peterson has not presented any evidence that Mr. Smeltzer knew the Subject Emails were false and acted outside his ethical obligations.  Moreover, given that this argument is based upon a claim that XPO's attorney (or XPO) violated some industry standard, it also fails because Mr. Peterson has not presented any testimony or evidence regarding the industry-wide customs or practices, uniform codes, or industry-specific regulations that it claims XPO or its counsel violated.  *See England Logistics*, 559 P.3d at 59 (noting that for purposes of this improper means prong the "'existence of an objective, industry-wide standard may be established in the same way it is established in the negligence context (through expert testimony regarding industry-wide customs or practices, uniform codes, industry-specific regulations, etc.)'") (quoting *C.R. England*, 437 P.3d at 355).

[109]   To the extent Mr. Peterson relies on "identity theft" to satisfy the improper means element, because that claim also fails (*see infra* at II.C.) it too cannot support his tortious interference claim.

information," and did so with "fraudulent intent."[110]  Even assuming that Mr.

Peterson has met all the other elements for such a violation, his claim fails because

he cannot establish the fraudulent intent element.

Mr. Peterson argues that he has met this element because he has provided

evidence that XPO was on notice that the Subject Emails were not genuine.[111]  In

support he further claims that XPO's attorney, Mr. Smeltzer, should have but did

not disclose to Leeway the concerns of which he was aware.[112]

Even assuming that Mr. Smeltzer was aware of these concerns, or that there

is a genuine dispute of fact on this issue, none of that helps Mr. Peterson.  The

reason is that the fraudulent intent element required to establish an identity theft

violation requires proof that Mr. Smeltzer or XPO subjectively believed the Subject

Emails were false and then used them to defraud or obtain something from Leeway.

*See, e.g., State v. Chukes*, 71 P.3d 624, 628 (Utah App. 2003) ("Although the identity

fraud statute does not define 'fraudulent intent,' Black's Law Dictionary indicates

that 'fraudulent intent' 'exists where one, either with a view of benefitting oneself or

misleading another into a course of action, makes a representation which one knows

---

[110]    Pl's Mot., ECF No. 250 at 7; *see also* UTAH CODE ANN. § 78B-6-1701(1) ("A petitioner who has been injured by a violation of Section 76-6-1102, Identity Fraud… may recover from the perpetrator"); UTAH CODE ANN. § 76-6-1102 (2) ("An actor commits identity fraud if the actor knowingly or intentionally uses, or attempts to use, the personal identifying information of another person, whether that person is alive or deceased, with fraudulent intent, including to obtain, or attempt to obtain, credit, goods, services, employment, any other thing of value, or medical information.").

[111]    *See* Pl's Mot., ECF No. 250 at 8.

[112]    *Id*. at 9

to be false or which one does not believe to be true.'") (quoting BLACK'S LAW DICTIONARY 662 (6th ed.1990)); *see also Rodriguez-Heredia v. Holder*, 639 F.3d 1264, 1268 (10th Cir. 2011) (recognizing that Utah's identity fraud statute "requires proof of a specific intent to defraud in all circumstances").[113]

As previously noted, Mr. Peterson has not presented any evidence sufficient for a jury to find that Mr. Smeltzer or XPO used the Subject Emails knowing, subjectively, that they were false and fabricated, with the intent to defraud Leeway. Accordingly, XPO is entitled to summary judgment as to Mr. Peterson's identity theft claim.

### D.    Injurious Falsehood

In order for Mr. Peterson to recover under a claim of injurious falsehood, he must prove:  (1) falsity of the statement made; (2) malice by Mr. Smeltzer (or perhaps XPO); and (3) special damages.  *See Direct Import Buyers Ass'n v. KSL, Inc.*, 538 P.2d 1040, 1042 (Utah 1975); *see also Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178, 1191 (D. Utah 2007) (citing *Direct Import*).

---

[113]    Although *State v. Chutes* was primarily concerned with the question of whether an identity fraud is a lesser included offense of a theft by deception violation or whether forgery is a lesser include offense of an identity fraud violation, it remains that *Chutes* is the sole Utah state court appellate authority to address the fraudulent intent element of an identity fraud violation and, as noted, it concludes that subjective knowledge of falsity is required.  Notably, a sister criminal fraud statue—communications fraud—in contrast expressly permits a reckless disregard standard.  *See* UTAH CODE ANN. § 76-10-1801 (7) (providing that "'a] person may not be convicted under this section unless the pretenses, representations, promises, or material omissions made or omitted were made or omitted intentionally, knowingly, or with a reckless disregard for the truth") (emphasis added). Any suggestion by Mr. Peterson that a showing of reckless disregard by XPO's as to the falsity of the Subject Emails is therefore misplaced.

Under Utah law, the "malice" element of an injurious falsehood claim requires proof that the defendant published the statements with actual knowledge of falsity. *See Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1199 (D. Utah 2024) (citing *Dillon v. S. Mgmt. Corp. Ret. Trust*, 326 P.3d 656, 666 (Utah 2014)).[114] Indeed, Utah's Model Civil Jury Instructions state that in order to find that a defendant acted with the requisite malice to prove an injurious falsehood claim, the plaintiff must prove that the defendant "actually knew the injurious statements were false when [he/she/it] published them." *See* MUJI 2D, CV1907.[115]

As has been noted many times, Mr. Peterson has not presented evidence sufficient for a jury to find that XPO or Mr. Smeltzer actually knew that the Subject Emails were false. Indeed, the only evidence presented establishes that XPO subjectively believed that the Subject Emails were authentic at the time they were

---

[114] Notably, *Dillon* reversed a determination that malice could be shown by establishing the defendant "knew or should have known" the falsity of the statement at issue. *See Dillon*, 326 P.3d at 666. Although *Dillon* dealt with a slander of title claim, Utah law considers the claims of slander of title and injurious falsehood to be equivalents. *See Jack B. Parson Companies v. Nield*, 751 P.2d 1131, 1134 (Utah 1988) (noting that "slander of title action" is also "known as an injurious falsehood or disparagement action"); *IHC Health Servs. Inc. v. ELAP Servs., LLC*, No. 2:17-cv-1245, 2018 WL 4688358, at *7 (D. Utah Sept. 28, 2018) ("Under Utah law, injurious falsehood combines the two related torts of slander of title and trade libel.") (citation omitted).

[115] The Committee Notes to CV1907 state that in *Dillon* the Utah Supreme Court clarified "that to show malice in a claim for slander of title, the plaintiff must prove that the defendant had actual knowledge that the statements at issue were false.'… This is a subjective, not objective, inquiry." MUJI 2D, CV1907 Committee Notes. The Committee Notes also provide that "[n]otably, the Dillon court did not hold that malice for injurious falsehood can be shown by proof of the defendant's reckless disregard for the truth. The malice standard for injurious falsehood in Utah, therefore, appears to be higher than the actual malice standard mandated by the First Amendment in defamation law, which incorporates the reckless disregard concept." *Id.*

published to Leeway. Accordingly, XPO is entitled to summary judgment as to Mr. Peterson's injurious falsehood claim.

## CONCLUSION

For the reasons discussed above, the court GRANTS XPO's Motion for Summary Judgment [ECF No. 248] and DENIES Mr. Peterson's Cross-Motion for Summary Judgment [ECF No. 250]. All of Mr. Peterson's claims against XPO are therefore DISMISSED. Further, Mr. Peterson's Motion for Hearing [ECF No. 274] is DENIED AS MOOT.

In addition, the parties are ORDERED to file a joint status report with the court within 20 days of entry of this Memorandum Decision and Order. That joint status report should identify precisely what, if any, claims remain in this action and any other matters that need to be addressed.[116] After reviewing that status report the court may schedule a status conference if needed.

SO ORDERED.

DATED this 15th day of April 2025.

BY THE COURT:

Clark Waddoups
United States District Judge

---

[116]    A prior Joint Status Report, ECF No. 218 at 3, dated July 23, 2020, suggests that that only remaining claims in this action may be XPO's two claims against Mr. Peterson: breach of contract and aiding and abetting the breach of fiduciary duty by Casey McKell.